```
 1                     UNITED STATES DISTRICT COURT
                          DISTRICT OF NEW JERSEY
 2

 3   GREGORY SURGICAL SERVICES,        .
     LLC,                              .
 4                                     .
             Plaintiff,                . Case No. 06-cv-00462
 5                                     .
     vs.                               . Newark, New Jersey
 6                                     . February 8, 2011
     HORIZON BLUE CROSS BLUE           .
 7   SHIELD OF NEW JERSEY, INC.,       .
                                       .
 8           Defendant.                .

 9

10                        TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE MADELINE COX ARLEO
11                UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13
     For the Class          BRUCE HELLER NAGEL, ESQ.
14   Plaintiffs:            Nagel Rice, LLP
                            103 Eisenhower Parkway
15                          Suite 201
                            Roseland, NJ 07068
16                          (973) 618-0400
                            Email: Bnagel@nagelrice.com
17
                            NEIL L. PRUPIS, ESQ.
18                          Lampf, Lipkind, Prupis & Petigrow
                            80 Main Street
19                          West Orange, NJ 07052
                            (973) 325-2100
20                          Email: Prupis@llpplaw.com

21                          CHARLES XAVIER GORMALLY, ESQ.
                            Brach Eichler, L.L.C.
22                          101 Eisenhower Parkway
                            Roseland, NJ 07068
23                          (973) 228-5700
                            Email: Cgormally@bracheichler.com
24

25
```

```
 1  For the Defendant:        B. JOHN PENDLETON, JR., ESQ.
                              DLA Piper LLP (US)
 2                            300 Campus Drive
                              Suite 100
 3                            Florham Park, NJ 07932
                              (973) 520-2561
 4                            Email: John.Pendleton@dlapiper.com

 5                            EDWARD S. WARDELL, ESQ.
                              Kelley, Wardell, Craig, Annin &
 6                            Baxter, LLP
                              41 Grove Street
 7                            Haddonfield, NJ 08033
                              (856) 795-2220
 8                            Email: Ewardell@kwclawyers.com

 9  Audio Operator:

10  Transcription Service:        KING TRANSCRIPTION SERVICES
                                  65 Willowbrook Boulevard
11                                Wayne, New Jersey 07470
                                  (973) 237-6080

12

13  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Commencement of proceedings at 10:32 a.m.)

 2

 3              THE COURT:  Good morning.  We're here in Glen Ridge

 4    versus Horizon.  Could I have appearances, please?

 5              MR. NAGEL:  Good morning, Judge, for the plaintiff,

 6    Bruce Nagel, Nagel Rice, and cocounsel with Neil Prupis

 7    Lampf, Lipkind, class counsel.  To my left is Charlie

 8    Gormalley, counsel to a number of class members.

 9              THE COURT:  Okay.  Good morning, everyone.

10              MR. PENDLETON:  Good morning, Judge, John

11    Pendleton, DLA Piper on behalf of the defendant Horizon.

12              MR. WARDELL:  And Edward S. Wardell for Horizon.

13              THE COURT:  And in the courtroom with you?

14              MR. PENDLETON:  Ms. Sherry --

15              THE COURT:  Okay.

16              MR. PENDLETON:  -- class counsel for Horizon.

17              THE COURT:  Welcome back.

18              MR. PENDLETON:  And Jonathon Reese [phonetic], an

19    employee of Horizon, who's involved in settlement

20    negotiations with class members.

21              THE COURT:  Okay.

22              MR. PENDLETON:  --

23              THE COURT:  Good morning.

24              MR. PENDLETON:  -- agreements.

25              THE COURT:  Okay.  I understand that there's been
```

1   some issues that have arisen and may preclude us going

2   forward on Thursday.

3           MR. PENDLETON:  Well, Judge, as I advised

4   Your Honor yesterday, we have a fairness hearing scheduled in

5   this matter for Thursday, about 48 hours from right now.  And

6   at this point, we have approximately 60 percent of the class

7   members having opted out of the settlement agreement.

8   Plaintiffs' counsel and Mr. Gormalley have been in

9   discussions with a number of the centers.  Horizon has also

10  been in discussions with some of the centers about becoming

11  in-network providers.  And that number may go down.

12  Plaintiffs' counsel believes it will go down.

13          But we're substantially above the 10 percent, as

14  Your Honor will recall, that is set forth in the agreement.

15  And if the number is above 10 percent, Horizon has the option

16  to void or terminate the settlement agreement.

17          We have extended the fairness hearing a few times

18  with court orders signed by Your Honor.  But at this point, I

19  think we need to have an explanation of what the plaintiffs'

20  game plan is and whether or not they foresee a significant

21  reduction in the opt-out -- revocation of the opt-outs so

22  that we have more people participate in the agreement.

23  Otherwise, even if Horizon wanted to proceed, I doubt

24  Your Honor would be in a position to approve such a

25  settlement, if we've got a 50 or 40 percent of the class

1    opting out.

2           So I -- I have requested with the consent of all

3    the attorneys that we meet with Your Honor today to discuss

4    the status of the matter.

5           THE COURT:  Okay.

6           Plaintiffs' counsel want to be heard?

7           MR. NAGEL:  Judge, we -- we have a situation,

8    obviously, which was put into place by virtue of a -- what we

9    considered as class counsel an unreasonable term, which was

10   insisted on by Horizon, which was the negative clawback.

11   Mr. Gormalley --

12          THE COURT:  That was part of the preliminary

13   approval.

14          MR. NAGEL:  That was part of the preliminary

15   approval.

16          THE COURT:  And I understand that that has been --

17   that is no longer part of the settlement.

18          MR. NAGEL:  That's right.

19          THE COURT:  There's no negative clawbacks, so

20   that's resolved.  So why do we still 60 percent opting out?

21          MR. NAGEL:  What happened is as a result of the

22   negative clawback, we have a major group of opt-outs.  So now

23   what we're trying to do is undo that.  We believe that there

24   will be a significant number of class members opting back

25   into the deal or revoking their opt-outs, but that cannot be

1    done in a week or two.  And the reason is this:  What Horizon

2    has done and very strategically and very smartly, they've

3    used the settlement to corral the class members into

4    in-network deals.  And as part of the in-network

5    negotiations, which are now going on with probably 25 to 30

6    percent of the opt-outs, they're requiring them to opt back

7    in, which is what they're obligated to do under the terms of

8    the settlement agreement.  They must encourage all class

9    members to go along with the deal.

10            We believe that that series of negotiations needs

11   to run its course.  We're not going to know whether they're

12   going to sign these in-network deals tomorrow, the next day,

13   or the next week.  We also are working with the opt-outs

14   directly, those that are not going in network, in order to

15   explain to them, why it's to their benefit to come back --

16            THE COURT:  What percentage of the 60 percent are

17   going in network?

18            MR. NAGEL:  We think in the neighborhood of 25 to

19   30 percent of it.

20            MR. PENDLETON:  I think that's -- that's very high,

21   Judge.  And the point I'll make is last week the plaintiffs

22   raised that this was an issue.  Mr. Wardell sent a letter to

23   them indicating -- so that they could pass it along to all

24   the class members, which they told us they were satisfied

25   with, which said that Horizon does not view that the network

1   discussions as having any involvement with their decision to

2   opt back in.  In fact, if anybody comes in network, we

3   require them to opt back into the settlement.  We have

4   required that.  We'll continue to require that.

5        The difference between the centers that we're

6   currently in negotiations with and the 60 percent is

7   approximately maybe 10 percent.  So it's still a significant

8   portion of the class that's remaining.

9        And I will just say in response to what Mr. Nagel

10  said, that we believe that we can conclude any and all

11  discussions about whether people are coming in network -- and

12  Mr. Reese can speak to this -- within the next two weeks at

13  the outside.

14       THE COURT:  How many surgery centers are you

15  talking about?  What's the universe?

16       MR. PENDLETON:  How many more are you talking to

17  still, Jon?

18       MR. REESE:  We're talking to at least a dozen.

19       THE COURT:  How -- what's the universe of surgery

20  centers that are part of this class?

21       MR. PENDLETON:  145?

22       THE COURT:  And do we know how many are definitely

23  in and are part of the settlement?

24       MR. PENDLETON:  We know that right now, two-thirds

25  of the 145 are in opt-out status, so one-third of the 145 or

 1     approximately 50, Judge, are in the settlement.

 2              THE COURT:  Okay.

 3              MR. NAGEL:  I would think that the two-week -- the

 4     two-week timeline outlined by Mr. Pendleton is probably

 5     the -- the drop-dead date.  I would think if we don't have --

 6     if we don't have the opt backs -- if we don't have the class

 7     members willing to go along with the deal, significantly less

 8     within two weeks, I think the deal is going to be terminated.

 9              THE COURT:  Have they raised any issues about the

10     attorneys' fees, because I know when we had Riker involved

11     early on, and -- two months ago before preliminary hearing,

12     that that was an issue.  Have any of them expressed to you

13     concern about attorneys' fees?

14              MR. NAGEL:  Not that I've heard, and there's not

15     been a single objection.  The only thing has been is

16     opt-outs; no objectors.

17              So I would think that the two weeks that

18     Mr. Pendleton outlined in terms of when he's going to get his

19     deals done, that's -- that's a deadline I think we can live

20     with.  And I would think within two weeks, we're either going

21     to have a deal or we're not going to have a deal.

22              As of now, it's clear that there's no deal.

23              MR. PENDLETON:  Judge, I would just say -- and,

24     again, Mr. Reese can speak to this because he and another

25     gentleman at Horizon are the principals involved in all of

1    these negotiations -- a lot of the centers have expressed --

2    called Horizon on their own and expressed significant concern

3    about the counsel fees.  How many, it's not a significant

4    majority or anything of the class, but the people that

5    Mr. Reese and Mr. Simeses [phonetic], and the other person

6    have been speaking to, have been very concerned about that

7    and have been motivated to call Horizon and not deal with

8    plaintiffs' counsel or Mr. Gormalley for that reason and that

9    reason alone.

10           THE COURT:  And how -- who is -- Mr. Gormalley, who

11   are you representing?

12           MR. GORMALLEY:  There's about 30 centers we've

13   entered an appearance for, Your Honor.

14           THE COURT:  And so you represent them independently

15   of Mr. Nagel?

16           MR. GORMALLEY:  Correct, Your Honor.

17           THE COURT:  And what about the surgery center that

18   Riker Danzig represented?  Are they still in -- involved?

19           MR. NAGEL:  They're in.

20           MR. GORMALLEY:  They went in network.

21           MR. NAGEL:  And they did not opt out.

22           MR. GORMALLEY:  Judge, I would address the

23   attorneys' fees issue as well because what -- what we've --

24   we're aware that network discussions are ongoing.  And the

25   way Horizon has been negotiating in-network discussion with

1   somebody that's opted out is requiring them to opt in and

2   then engaging in discussion, which basically immunizes the

3   class member from the impact of attorneys' fees, and by that,

4   I mean Horizon is requiring the class member to assign all

5   the benefits of being a class member to Horizon in return for

6   a payment from Horizon to come in network.  And while that's

7   not directly an objection to attorneys' fees, a class member

8   objecting to attorneys' fees can basically have a network

9   discussion with Horizon and not pay attorneys' fees under

10  this class, doesn't impact on the payments coming to the

11  class --

12          THE COURT:  Well, here's the concern I have.  First

13  of all, let me just make something very clear:  If there's

14  not -- I will not final -- I will not approve the class

15  unless you're very close to the hundred percent.  There has

16  to be at least 90.  I -- you know, this is a tenuous

17  settlement agreement, and I'll wait and see, but if there's

18  40 or 50 percent or even 30 percent that are opting out, I

19  will have great reservations about approving this as a class.

20  I want everyone to know that.  I've said that all along,

21  number one.

22          Number two, none of this is news to me.  We were

23  here two months ago, and it was explained to me that class

24  members who go in network, would not be responsible for that

25  payment of attorneys' fees going forward.  And that's always

 1    been the deal, and it's always been my concern that the

 2    smaller the class or the smaller the people that go in

 3    network, the smaller -- more people will share the burden of

 4    attorneys' fees.  And that's a concern.

 5            So I'm not sure where this is headed.  But I

 6    want -- we worked very hard on on the one hand.  On the other

 7    hand, I'm here to make sure it's fair and that everyone's

 8    rights are protected.  And I have -- I'm frankly surprised

 9    that there's this much resistance and 60 percent of the class

10    is out.  That's concerning to me.  It's -- it's not something

11    that I -- you know, I take lightly.  I was under the

12    impression -- I would have expected at least 10 percent,

13    maybe a little bit more, would opt out.  But to have a 60

14    percent opt-out suggests to me that there's a problem with

15    this settlement that we're trying to put together.  So -- and

16    I want to know and I will -- and I -- I'm not sure how we're

17    going to go forward, but I may want to -- I may want some of

18    the representative client -- I'm hoping that more will come

19    for the final hearing on the date I give you, because I want

20    to make sure that everyone is -- who's in is in and there's

21    not going to be problems post -- post approval, because this

22    is unlike -- and I've said this all along -- unlike many

23    set- -- many class actions where you may -- at the end of the

24    day you get a rebate check -- a very small rebate check or an

25    new tire for your car or a new washing machine, and although

1    all of those are all significant events, this is -- this case

2    involves the livelihood and the income of doctors.  And

3    that's big.  That is not -- you know, we -- if you don't get

4    the -- the $3 rebate check or the new tire, it's not going to

5    be life-altering.  This is life-altering for professionals.

6           We're lawyers, we're professionals.  If there was a

7    class action that would affect our income going forward for a

8    number of years, we would be very concerned about it.

9           And there's enough worries in health care reform

10   generally for doctors and medical professionals that, you

11   know, this affects the livelihood not only of doctors and

12   their families, but of all support staff that work at these

13   surgery centers.  So this is a big one.  And I don't -- I

14   take it very seriously that I want to make sure that everyone

15   knows what they're buying into.  The preliminary approval --

16   you know, the papers in support of it were complicated.  It's

17   not as simple as you'll get a rebate check, you can -- you'll

18   get your television repaired, you will get a new washing

19   machine filter.  It's not that simple.  It's very

20   complicated.

21          And I will not rush it.  And I know -- I know

22   there's urgency here for Horizon.  But I'm not going to rush

23   it.  I want to make sure everyone there's -- that this class

24   is fully informed, they're comfortable with the deal, they're

25   comfortable with the attorneys' fees, and they make a -- they

1   make an intelligent decision to participate in the

2   settlement.  And if they don't, then we'll be back to square

3   one, which is I will not approve it and we'll be back to a

4   lawsuit.

5           So I just want you to know where I'm coming from,

6   because to me these are not -- the terms of the settlement

7   are not a surprise.  The fact there was going to be

8   in-network deals are not a surprise.  The fact that there's

9   an attorneys' fees changes on whether you're in -- in or out

10  of network isn't a surprise.  Nothing's really a surprise.

11          But what is a surprise to me in February is that we

12  have 60 percent of the class opting out.  We originally were

13  to have this hearing, I believe in December.  So it's six

14  weeks later and we're still not there.  So I will -- I'm

15  happy to give you one more chance to see if we can make it

16  work, but I think prior to the date I give you, I want to

17  have another conference with counsel, because I don't want to

18  walk into a mine field the day of the approval hearing and

19  have an approval hearing if it's not feasible.

20          Mr. Prupis?

21          MR. PRUPIS:  Your Honor, I would like to basically

22  describe to you the process.  When we talk to the centers, I

23  also talk to the attorneys for the centers; every one of

24  these centers has an individual attorney.

25          THE COURT:  On top of Mr. Gormalley?

 1              MR. PRUPIS:  Yes.  Oh yes.  Oh yes.  Sometimes I

 2    talk to more than one attorney with respect to a center.  And

 3    I have to describe the entire settlement, and I have to talk

 4    about the economics on a going-forward basis.  And we talk

 5    about whether it makes sense to go in network or not go in

 6    network.  The actual process of communicating with these

 7    centers has been extremely prolonged.  For example,

 8    yesterday -- and a lot of these centers control, like, maybe

 9    seven centers by one person.  We have a couple of large

10    companies that manage these centers.  So one management

11    company's involved with seven centers or six centers.  So

12    even though we talked about maybe 60 centers not being

13    involved, 20 or 30 of them are controlled by two or three

14    people.  So there is tremendous amount of conversation.  When

15    we have conversation with those centers, then the centers'

16    people have to go back to the doctor-owners for a vote --

17              THE COURT:  I hear you.  I -- I hear you.  I don't

18    dispute that.

19              But what my point is more fundamental.  It's

20    complicated.  It's not simple.  The fact that you -- they

21    have lawyers -- I'm not even sure what the role of

22    Mr. Gormalley is.  Mr. Gormalley want- -- he's not class

23    counsel that I've approved.  I would have class counsel

24    Mr. Prupis and Mr. Nagel only, their firms.

25              Are you -- you're not counsel of record,

 1  Mr. Gormalley.  I'm letting you speak today as a courtesy.

 2            MR. GORMALLEY:  I've appeared for about 30 centers.

 3  I filed notice of appearance, Judge.

 4            THE COURT:  What does that mean?  I mean this is

 5  a --

 6            MR. GORMALLEY:  At the time I filed it, Judge, I

 7  didn't know whether I was filing for objectors or opt-outs --

 8            THE COURT:  Right.  But why not -- let's talk about

 9  it.  We're lawyers.  Let's talk about it.

10            This is a class action.  This is not a multi-party

11  action.  It's a class action.  There's been a preliminary

12  approval.  And I've appointed Nagel Rice and Mr. Prupis's

13  firm as class counsel.

14            MR. GORMALLEY:  Correct, Judge.  And I got involved

15  in negotiating improvements to the originally approved

16  settlement that Your Honor then amended the deal and --

17            THE COURT:  Right, but --

18            MR. GORMALLEY:  Since then we've been try- --

19            THE COURT:  Right.  But this is for counsel -- I'm

20  letting you to speak today as a courtesy and because you're

21  sitting with Mr. Prupis and Mr. Nagel.  But you're not

22  part -- you will not share in the attorneys' fees, as I know

23  it, that I've approved because there's no mechanism for that.

24  You haven't intervened as class -- you haven't -- motion to

25  file an appearance as class counsel before me.  I'm just

1    hearing from Mr. Prupis that in addition to you, they --

2    everyone has their own lawyers, so we have --

3              MR. GORMALLEY:  Judge -- Judge -- I think the

4    amended settlement agreement contemplates I will be filing a

5    fee application with respect to improvements that have been

6    made to the substantive portions of the settlement after it

7    was originally approved by Your Honor.  That's in the amended

8    proposal.  Only to come out of class counsel's fee, not an

9    additional fee to the class.  I have been actively involved

10   in negotiating improvements to the settlement as well as

11   communicating to the class whether or not they should be

12   opting into the settlement or not.  That's been my role.  I'm

13   here only because I was asked to be here today.

14             THE COURT:  So Mr. Prupis said they have you and

15   they have other private counsel as well?

16             MR. GORMALLEY:  Judge -- Mr. Prupis --

17             THE COURT:  I mean it sounds -- it sounds very odd

18   to me.

19             MR. GORMALLEY:  It's somewhat complicated, Judge.

20   You have management companies that manage the day-to-day

21   affairs of operating surgery centers.  I got involved in

22   representing the ownership interests of surgery centers.

23   Those owners ask me whether or not they should opt in.  The

24   management company also weighs in on that issue, not only for

25   that center, but other centers.  The management company has

1  separate counsel as well.  All of these individuals have --

2  and the physicians and the practices themselves have

3  different counsel.  So there's -- it's not all like this, but

4  many of them have multiple layers of attorneys that get

5  involved in the discussion.  It's not a simple arrangement.

6          MR. PENDLETON:  Judge, the amended agreement that

7  Your Honor did approve does talk about Mr. Gormalley's firm

8  making an application for fees not to exceed $500,000, which

9  comes out of any award that Your Honor might approve for

10 class counsel.  It's not in addition to; it's part of.  And

11 that was in the amended order.

12         I think, Judge, we're looking at -- what we need to

13 look at is an extension, one more extension, as Your Honor

14 indicated, and two weeks from the Thursday date would be

15 Thursday the 24th.

16         THE COURT:  I won't be here that week.  So it will

17 be the next week.

18         MR. PENDLETON:  Could we do it on Monday the 28th?

19         MR. NAGEL:  I'm coming back from vacation --

20         THE COURT:  No.  I'm coming back from vacation.  It

21 doesn't work for me.  It'll be later in that week.  It's a

22 busy week for me.  I want to have a status conference with

23 the lawyers first.  So I'm sorry, but I can't do it that day,

24 and I don't think it's wise for me to come back from vacation

25 with mail and problems and potential letters and opt-outs

1   and -- and it wouldn't be fair to the class members to do

2   that.  So I'm not going to do it.  So what I'd like to do

3   first is that week back -- I'm also on criminal duty that

4   week, which is not a good thing.  And so what I'd like to do

5   is talk to you that first week.  We'll have a phone

6   conference at 3:30 on March 1st.  And I'm going to have to

7   move some things around for the following -- so I want to

8   keep the whole morning open for this hearing.  We will have

9   it on March 9th at 10 o'clock.

10          MR. PENDLETON:  And just so that we're clear, we've

11  done this each time as we've extended these deadlines,

12  Your Honor, all of the deadlines from the original order will

13  be summarily extended, and I think the implementation date,

14  as I've discussed with class counsel previously, we need to

15  implement any settlement that might be approved on the 1st or

16  the 15th of a month, so we're talking about March 9th, we're

17  talking about an implementation date that'd probably make

18  sense would be April 1st, so that Horizon has a couple of

19  weeks to -- to gear up to do that --

20          THE COURT:  Is that -- is it better to have it the

21  following week or that -- the March 9th date is okay?

22          MR. NAGEL:  Yeah, that may present a problem,

23  Judge, because, again, what's -- what's happening here is

24  that we're not -- while they are implementing it later,

25  they're not extending the three-year period we negotiated, so

 1  on the implementation date, we're going to have to talk to

 2  Mr. Pendleton and counsel --

 3          MR. PENDLETON:  Yeah, I -- she already just told

 4  me, we can do it on March 15th -- the thing, so that's -- I

 5  was thinking that might be a little tight, but apparently we

 6  can do that.  So if we have the hearing on March 9th -- did

 7  you say at 10 o'clock in the morning, Your Honor?

 8          THE COURT:  Yes.  What date did you -- we'll make

 9  it 11, so -- we could talk to counsel before we do anything,

10  if necessary.

11          MALE SPEAKER:  Okay.

12          THE COURT:  So the -- get here a little earlier.

13          MR. PENDLETON:  The implementation --

14          THE COURT:  Do you want it the 9th, or do you want

15  the 15th?

16          MR. PENDLETON:  No, no, the hearing on the 9th.

17          THE COURT:  Okay.

18          MR. PENDLETON:  And then the settlement would be

19  implemented on March 15th.

20          THE COURT:  Okay.

21          MR. NAGEL:  That's an open issue, Judge.  That's an

22  open issue, because, again, if you push the implementation

23  date back, we need to push the three years back.  Horizon has

24  not agreed to that.

25          THE COURT:  Right.

```
 1              MR. NAGEL:  So --

 2              THE COURT:  But alternative is we can't go -- if we

 3   were to go forward Thursday, I would not prove it and we'd be

 4   back to square one with no settlement.

 5              MR. NAGEL:  I hear that.

 6              THE COURT:  So I mean we're pushing it back at

 7   plaintiffs' counsel's request.

 8              MR. NAGEL:  We're pushing it back at every -- a

 9   joint -- it's a joint request.

10              THE COURT:  Well, it's a joint request because it

11   can't -- I'll go forward with Thursday.  I'm ready.  You want

12   to go forward with Thursday?

13              MR. NAGEL:  There's no need to go forward --

14              THE COURT:  Because there'll be no hearing --

15   there'll be a -- on Thursday there will be a finding from me

16   that there'll be no settlement.  I will not approve a class

17   of 40 percent.

18              MALE SPEAKER:  I agree.

19              THE COURT:  So that's the problem.  And you can try

20   to work it out, but this is -- this is it.  If -- if -- I

21   want to make something very clear.  This is now three months

22   past December.  The core terms are exactly what we talked

23   about in November and December.  If it -- if there's not 90

24   percent on March 9th, this settlement -- we'll go back to

25   square one.  We'll go back to discovery, and we'll go back to
```

1    motion practice.  That's what it'll be.

2             MR. NAGEL:  I would just ask that Your Honor keep

3    an open mind with the 90 percent issue, because Horizon

4    indicated that they're willing to go forward if it's in

5    excess of 10 percent.  So I'd ask Your Honor to just leave

6    the --

7             THE COURT:  We'll see where -- we'll see how far it

8    is, how -- what the -- and I'm not going to draw a line in

9    the sand.  I want to know which surgery centers there are.  I

10   want to know -- you could -- they're not -- no one is here

11   today, but I would like to know, if possible, for whatever

12   percentage of folks are opting out, why.  I want to know why.

13   Is it -- is it the terms?  Is it the counsel fees?  Is it

14   they're going -- you know -- what -- I want to know why,

15   because I made preliminary findings that this was a great

16   deal going forward for class members, that they had a great

17   benefit in terms of not only -- not only recouping prior

18   losses but having a more favorable rate going forward.  And

19   since -- the only thing that's changed since the preliminary

20   approval is that -- that for past amounts due, Horizon will

21   no longer be recouping.  So if anything, the settlement has

22   become more favorable to the class members than the one I

23   approved.  I want to know why.  So my ad- -- my

24   recommendation is if there is more than 10 percent that are

25   not -- that are opting out of this class, I need to know why,

 1  if you want me to approve it.  I'm -- like live witnesses why

 2  or sworn affidavits why, either by their -- you know, I'm

 3  glad to hear from Mr. Prupis that everyone seems to be

 4  represented by counsel, so we're not going to have -- we

 5  certainly have the ability for class counsel to ask why

 6  through counsel and to present those findings to the Court

 7  because I need to know why, if I'm going to go below the 10

 8  percent, is this an anomaly, it's just a -- I don't want to

 9  deal with Horizon anymore.  I mean, I need to know why.

10  Okay?

11            MR. PENDLETON:  Okay.  We'll let Your Honor know.

12            THE COURT:  Anything else?

13            UNIDENTIFIED SPEAKERS:  Thank you, Your Honor.

14            THE COURT:  See you March 9th.  Thank you.

15            FEMALE SPEAKER:  All rise.

16            (Conclusion of proceedings at 10:56 a.m.)

17

18

19

20

21

22

23

24

25

Certification

1                           Certification

2     I, SARA L. KERN, Transcriptionist, do hereby certify

3  that the 23 pages contained herein constitute a full, true,

4  and accurate transcript from the official electronic

5  recording of the proceedings had in the above-entitled

6  matter; that research was performed on the spelling of proper

7  names and utilizing the information provided, but that in

8  many cases the spellings were educated guesses; that the

9  transcript was prepared by me or under my direction and was

10  done to the best of my skill and ability.

11     I further certify that I am in no way related to any of

12  the parties hereto nor am I in any way interested in the

13  outcome hereof.

14

15

16

17

18  s/ *Sara L. Kern*            February 15, 2011

19  _____    _____

    Signature of Approved Transcriber        Date

20

21

    Sara L. Kern, CET**D-338

22  King Transcription Services

    65 Willowbrook Boulevard

23  Wayne, NJ 07470

    (973) 237-6080

24

25